IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEITH LANSKY,              )    CASE NO.  1:24-CV-01231-JDG
                           )
         Plaintiff,       )
                           )
     vs.               )    MAGISTRATE JUDGE
                           )    JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL   )
SECURITY,            )    **MEMORANDUM OF OPINION AND**
                           )    **ORDER**
         Defendant.    )

Plaintiff, Keith Lansky ("Plaintiff" or "Lansky"), challenges the final decision of Defendant, Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In June 2021, Lansky filed an application for SSI, alleging a disability onset date of April 1, 1991, and claiming he was disabled due to attention deficit/hyperactivity disorder, bipolar disorder, and spinal cord injury.  (Transcript ("Tr.") at 15, 67.)  The application was denied initially and upon reconsideration, and Lansky requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On June 29, 2023, an ALJ held a hearing, during which Lansky, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On August 7, 2023, the ALJ issued a written decision

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

1

finding Plaintiff was not disabled.  (*Id.* at 15-34.)  The ALJ's decision became final on June 3, 2024, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On July 19, 2024, Lansky filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8, 10.)  Lansky asserts the following assignments of error:

> (1) The ALJ found, at step three, that Mr. Lansky's cognitive impairment did not meet or equal the requirements of Listing 12.05B. This finding is unsupported by substantial evidence when the record documents that Mr. Lansky has a full scale IQ of 55 and Mr. Lansky has significant deficits of adaptive functioning.
>
> (2) The ALJ found, at step five, that Mr. Lansky is capable of performing a significant number of jobs in the national economy. This finding is not supported by substantial evidence when the ALJ's residual functional capacity finding is not an accurate assessment of Mr. Lansky's mental limitations.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Lansky was born in August 1984 and was 38 years-old at the time of his administrative hearing (Tr. 15, 32), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  He has at least a high school education.  (Tr. 33.)  He has no past relevant work.  (*Id.* at 32.)

### B.    Relevant Medical Evidence[2]

On August 24, 2018, Lansky saw Megan Raleigh, LISW, for a mental health biopsychosocial assessment at Lorain Correctional Institution.  (*Id.* at 427.)  Raleigh noted the reason for referral as possible intellectual and developmental disability.  (*Id.*)  Raleigh further noted a review of Lansky's past incarceration records revealed he met the criteria for mild intellectual disability and had been on the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Lansky challenges only the ALJ's findings regarding his mental limitations, the Court further limits its discussion of the evidence to Evans' mental impairments.

mental health caseload before for mild intellectual disability, but there was no history of mood dysfunction or mental health concerns. (*Id.*) Lansky described his concentration as "'average,'" although he could not focus on a book if he wanted to, and described his mood as "'content.'" (*Id.*) He denied feeling helpless or hopeless. (*Id.*) He endorsed an average energy level and good sleep. (*Id.*) He described reading as one of his coping skills. (*Id.* at 429.) Raleigh noted Lansky was engaged in the assessment and answered questions appropriately. (*Id.* at 427.) On examination, Raleigh found organized and linear thought content. (*Id.*) Raleigh further found normal speech, although there was "[s]ome impairment with pronunciation" that may be related to Lansky's intellectual disability, euthymic mood and affect, and full orientation. (*Id.* at 432.) Raleigh noted Lansky appeared to have "subaverage intelligence per Mild IDD dx and CASAS scores." (*Id.*) His attention seemed average, and his concentration seemed fair, although he needed "some redirection" even though he was responsive. (*Id.*) Raleigh further found intact memory and poor judgment and insight. (*Id.*) Raleigh referred Lansky to counseling once a month "to build socialization skills and personal communication goals," and five sessions of coping skills psychoeducational group therapy "to build on group socialization and interpersonal communication." (*Id.* at 433.)

On November 6, 2019, Lansky saw psychologist Kimberly Kohli for counseling while at Marion Correctional Institution. (*Id.* at 340.) Lansky denied any issues or concerns and reported good sleep and appetite. (*Id.*) On examination, Dr. Kohli found full orientation, concrete thoughts, direct eye contact, pleasant and talkative demeanor, cooperative behavior, calm mood and congruent affect, and intact memory. (*Id.*)

On July 30, 2020, Lansky saw R. Davison, LSW MHL, for a 30-day release planning meeting. (*Id.* at 280-81.) Lansky told Davison he was doing well and looking forward to his release in August 2020. (*Id.* at 280.) Lansky reported he would be going to Oriana House upon release, where he would receive

case management services.  (*Id.* at 280.)  On examination, Davison found normal appearance, euthymic mood, and no observable mental health signs or symptoms.  (*Id.* at 281.)  Davison noted Lansky was "deemed stable in mood and functioning."  (*Id.*)

On August 18, 2020, Lansky underwent a Non-Medical-Psychiatric Diagnostic Assessment.  (*Id.* at 473.)  Lansky endorsed depressed mood and mood swings.  (*Id.* at 484-85.)  Although he denied anxiety, treatment providers noted Lansky appeared anxious throughout the assessment, as he "was very fidgety and shook his legs the entire time."  (*Id.* at 484.)  On examination, treatment providers found full orientation, intact memory, attention, and concentration, below average intellect, impaired abstract thinking, intact impulse control, intact judgment, impaired insight, anxious/worrisome appearance, cooperative attitude, depressed mood and affect, intact thought process, normal speech, and good eye contact.  (*Id.* at 487-88.)  Treatment providers noted Lansky "has a history of prior treatment of both SUD and MH and a pattern is evident in that when in a controlled environment he begins to stabilize the MH and SUD symptoms."  (*Id.* at 489.)  Treatment providers further noted Lansky would benefit from part-time employment and help with getting his SSI benefits.  (*Id.*)

On May 4, 2021, Lansky saw Amber Bundy, LPCC, for a behavioral health assessment.  (*Id.* at 851-61.)  Lansky reported being homeless with no income and no food stamps, and that he needed to be connected to psychiatric services so he could resume his medications.  (*Id.* at 851.)  Lansky endorsed a depressed/sad mood, irritability, anxiety, inattention, and sleep difficulties.  (*Id.* at 856-57.)  He told Bundy he did not like to be around a lot of people.  (*Id.* at 857.)  He stated he had been off his ADHD medication for a week and was starting to notice problems with focusing.  (*Id.*)  He could not remember the names of his medications.  (*Id.*)  On examination, Bundy found disheveled appearance, normal speech, euthymic mood, full affect, circumferential associations, fair insight and judgment, and fair hygiene and grooming.  (*Id.* at 858-59.)  Lansky's diagnoses consisted of adjustment disorder with mixed anxiety and

4

depressed mood and unspecified ADHD.  (*Id.* at 860.)  Bundy recommended case management services and a referral for a psychiatric evaluation to resume medications following Lansky's release from Oriana House.  (*Id.* at 861.)

On September 3, 2021, LaVonne Davis, Lansky's case manager, completed a Third Party Adult Function Report.  (*Id.* at 199-206.)  At that time, Lansky was living in a men's shelter.  (*Id.* at 199.)  Lansky cared for his personal care himself, although he needed reminders to take his medications.  (*Id.* at 200-01.)  He could make his bed and wash his clothes with minimal assistance.  (*Id.* at 201.)  He could go out alone.  (*Id.* at 202.)  He could shop in stores and purchase a small number of items at the local convenience store.  (*Id.*)  Lansky could not pay bills, handle a savings account, or use a checkbook/money order, although he could count change.  (*Id.*)  Davis noted Lansky was limited in his capacity to manage his funds and would benefit from supportive education to comprehend maintaining budget.  (*Id.*)  Lansky spent time watching TV, engaging with other residents at the shelter, and playing cards.  (*Id.* at 203.)  He spent time with others in person and on the phone, including texting and video chatting.  (*Id.*)  Davis described Lansky's ability to pay attention as "average," although he may need redirection to focus on instructions.  (*Id.* at 204.)  He had an average ability to follow spoken instructions and a below average/average ability to get along with authority figures.  (*Id.* at 204-05.)  He had an average ability to handle stress.  (*Id.* at 205.)  Davis noted Lansky had a below average ability to handle changes in routine, and that he may need redirection to understand the process.  (*Id.*)

On August 16, 2022, Lansky underwent a consultative psychiatric examination with Thomas Evans, Ph.D.  (*Id.* at 653.)  Dr. Evans noted Lansky's caseworker drove him to the appointment, and Lansky was cooperative and friendly throughout the evaluation.  (*Id.*)  Lansky reported a history of special education classes in school, and that he had graduated high school.  (*Id.* at 654.)  He had never been employed.  (*Id.*)  Lansky told Dr. Evans he had never been psychiatrically hospitalized.  (*Id.*)  He reported seeing a

5

psychiatrist in prison and that he was currently seeing someone at the Nord Center for counseling every two weeks.  (*Id.*)  Lansky did not recall the name of his therapist.  (*Id.*)  Lansky stated he had been on ADHD medication since September 2021, but he did not know the name of his medication.  (*Id.*)  Lansky endorsed feeling down a few times a month but denied anxiety.  (*Id.*)  He told Dr. Evans he was able to go to the grocery store, movies, and restaurants by himself.  (*Id.*)  Lansky described a typical day at the shelter as getting up, leaving the shelter, and taking walks before returning to the shelter between 8:30 and 10:00 p.m. (*Id.* at 655.)

On examination, Dr. Evans found Lansky casually dressed with good grooming and hygiene, normal speech, good eye contact, euthymic mood, consistent affect, full orientation, and adequate insight and judgment.  (*Id.*)  Lansky spelled "world" forward and backward, knew the current and past president, recalled one out of three words after a five-minute delay, and could recite four digits forward and three backward.  (*Id.*)  Wechsler Adult Intelligence Scale-IV testing revealed a Full Scale IQ of 55, which placed Lansky in the "Extremely Low Classification" and at the .1 percentile.  (*Id.* at 655-56.)  Dr. Evans diagnosed Lansky with unspecified intellectual disability and deferred a diagnosis of ADHD, as there were no signs of ADHD observed during the evaluation.  (*Id.* at 656.)  Dr. Evans determined it was "highly questionable" whether Lansky could manage his benefits without supervision "given his cognitive limitations."  (*Id.* at 657.)  Dr. Evans opined Lansky "would be limited to understanding and carrying out very simple instructions in a workplace setting."  (*Id.*)  While Lansky showed good attention and concentration during the entire evaluation, his cognitive test scores "indicate[d] he would be limited to completing very simple, single step tasks in a workplace setting."  (*Id.*)  Dr. Evans opined there did not seem to be any psychiatric reasons that would prevent Lansky from getting along with coworkers and supervisors or impair Lansky's ability to respond to typical stressors in the workplace.  (*Id.*)

On January 23, 2023, Lansky underwent a psychiatric evaluation with Rachel Ehret, CNP, RN.  (*Id.*

at 833, 838.) Lansky reported a recent diagnosis of bipolar disorder and a past diagnosis of ADHD. (*Id.* at 833.) Lansky stated he had been told he did not need medication for his bipolar disorder, but he thought he did as now he "get[s] mad and start[s] flipping out." (*Id.*) He endorsed mood fluctuations, increased energy and/or manic episodes, impulsivity, compulsive behavior, irritability and/or agitation, lack of sleep but feeling energized, lack of centration, rapid speech, delusions, false belief of superiority, racing thoughts, paranoia, unstable relationships and drug use, risk taking behavior, and occasional excessive spending. (*Id.*) Lansky also endorsed restlessness, distractibility, unfinished tasks, fidgeting, inability to sit still, hyperactivity, absentmindedness, forgetfulness, boredom, depression, and learning disability. (*Id.*) He told Ehret he wanted to go to college to study business and then open his own business. (*Id.* at 835.) Ehret diagnosed Lansky with bipolar disorder, although she noted rule out bipolar disorder, and started Lansky on Celexa and Abilify. (*Id.* at 837.)

On February 23, 2023, Lansky saw Ehret for follow up and reported doing "okay," although Abilify was making him nauseous. (*Id.* at 839, 842.) On examination, Ehret found normal speech, "'okay'" mood, congruent affect, linear thought process, intact associations, full orientation, and poor insight and judgment. (*Id.* at 839-40.) Lansky told Ehret he wanted to try a different medication since Abilify was upsetting his stomach. (*Id.* at 840.) Ehret discontinued Abilify and prescribed Seroquel. (*Id.* at 841.)

On February 10, 2023, LPCC Bundy completed a Mental Residual Functional capacity Assessment. (*Id.* at 669-71.) Lansky's diagnoses consisted of generalized anxiety disorder, major depression, recurrent, mild, and ADHD. (*Id.* at 669.) Bundy opined Lansky would be off-task 15-20% of the workday. (*Id.*) Bundy explained Lansky "would likely experience episodes of inattention and inability to stay on task while working." (*Id.*) Bundy stated she "would expect occasional absences, maybe 2-4 per month," but the bigger issues would be related to Lansky's ability to stay on task, his need for reassurance, and his ability to follow instructions and accept feedback. (*Id.* at 670.) Bundy opined Lansky had a marked limitation in his ability

7

to maintain attention and concentration for extended periods of time.  (*Id.*)  Bundy explained Lansky "has always displayed low intellectual functioning with issues related to focusing and concentration."  (*Id.* at 671.)  Lansky "experiences anxiety that impacts him daily, specifically related to his legal issues and staying on track but also displays a need for constant reassurance."  (*Id.*)  At times, Lansky "displays symptoms of being helpless, hopeless related to his homelessness, physical and mental health issues as well as his legal barriers."  (*Id.*)

## C.      State Agency Reports

On March 22, 2022, Paul Tangeman, Ph.D., reviewed the file and opined Lansky had moderate limitations in his ability to understand, remember, or apply information, concentrate, persist, or maintain pace, and adapt or manage himself.  (*Id.* at 71.)  Dr. Tangeman further opined Lansky had no limitation in his ability to interact with others.  (*Id.*)  Dr. Tangeman determined Lansky was capable of "simple, routine and repetitive type tasks."  (*Id.* at 74.)  Lansky could "carry out simple, routine, 1-3 step tasks and make simple decisions in a setting without fast pace demand."  (*Id.*)  Dr. Tangeman opined Lansky "would perform best in a relatively static environment where changes are infrequent and/or explained" and "which does not require strict production or rapid pace demands."  (*Id.* at 75.)  Dr. Tangeman noted Lansky's "[a]daptive behaviors are higher than obtained test scores."  (*Id.*)

On November 23, 2022, Karla Delcour, Ph.D., affirmed Dr. Tangeman's findings.  (*Id.* at 80, 84-85.)

## D.      Hearing Testimony

During the June 29, 2023 hearing, Lansky testified to the following:

- He lives alone in an apartment.  (*Id.* at 46.)  He has lived alone for three months now, and it is going well.  (*Id.*)  He can manage his household chores.  (*Id.* at 47.)  He spends his time listening to music, watching TV, and doing chores.  (*Id.*)  He can leave his house, but he chooses not to because he has everything he needs in his house.  (*Id.*)  He has a caseworker who takes him grocery shopping.  (*Id.* at 48.)  He gets his food stamps once a month, and he goes grocery shopping twice a week.  (*Id.*)

8

He does not hold a driver's license, and he has never had one.  (*Id.*)  He either takes a bus or his caseworker drives him where he needs to go.  (*Id.*)  He does not have any problems riding the bus.  (*Id.*)

- He had received disability benefits from the time he was nine months old until he went to prison for his learning disability.  (*Id.* at 52-53.)

- He was in special education classes in school, and he had an IEP in middle and high school.  (*Id.* at 53.)  He can read.  (*Id.*)  Most of the time it's hard for him to read because of fine print, but if it is big print, he can read everything.  (*Id.*)  If he is wearing his glasses, he can read and comprehend what he is reading.  (*Id.*)  He has a hard time with addition and subtraction, but he knows how much change he should get back at the store if he uses a calculator.  (*Id.* at 54.)  If he did not use a calculator, he would not know how much change he should receive.  (*Id.*)  He can take the bus somewhere unfamiliar, because he usually has his glasses and he can follow directions.  (*Id.*)  He has a problem with learning new things, and he needs extra help when learning something new.  (*Id.*)  It is hard for him stay focused.  (*Id.* at 55.)  He can focus on a TV show or a movie, but if something else comes up, like a knock on his door, he'll forget what he is doing.  (*Id.*)

- He stays to himself.  (*Id.* at 60.)  He doesn't even try to be around other people.  (*Id.*)  If he is around other people, most of the time they "bump heads," and he goes back to being by himself.  (*Id.*)

The ALJ found no past work.  (*Id.* at 61.)  The ALJ then posed the following hypothetical question:

> So, if you would, please assume a hypothetical individual of the claimant's age and education and with no past work experience.  Further assume this individual is limited as follows.  This is a light exertional hypothetical with the following additional limitations.  This person can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally stoop, kneel, crouch, and crawl.  This person can never work at unprotected heights or near dangerous moving machinery and cannot engage in commercial driving and can tolerate no more than frequent exposure to vibration.  Additionally, this person can understand, remember, carry out, and complete simple, routine, and repetitive tasks with no strict production rate pace requirements, and can adapt to only occasional and routine workplace changes.  Can this hypothetical individual perform any work in the national economy?

(*Id.*)

The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as housekeeping cleaner, mail clerk, and office helper.  (*Id.* at 61-62.)

In response to a question from Lansky's counsel, the VE testified that a limitation to a reasoning level of 1 would preclude all work.  (*Id.* at 64.)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

10

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since June 30, 2021, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments: spinal stenosis, status post C6 anterior corpectomy and C5-7 instrumentation fusion; attention deficit hyperactivity disorder (ADHD); intellectual disability; and substance addiction disorders, alcohol and drugs (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; can never work at unprotected heights or near dangerous moving machinery, and cannot engage in commercial driving; can tolerate no more than frequent exposure to vibration; can understand, remember, carry out, and complete simple, routine, and repetitive tasks, with no strict production rate pace requirements; can adapt to occasional and routine workplace changes.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on August **, 1984 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since June 30, 2021, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-34.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Step Three

In his first assignment of error, Lansky argues that the ALJ "unreasonably found that Mr. Lansky's impairments do not meet or equal the requirements for Listing 12.05B." (Doc. No. 8 at 11.) Lansky points to evidence that 2022 testing revealed a full scale IQ of 55, along with a history of special education classes, past intellectual testing results of a full scale IQ of 56, and reading, writing, and math skills at a third grade level. (*Id.* at 11-12.) Lansky asserts this evidence satisfies Listing 12.05B1a and

12.05B3. (*Id.* at 12.) Lansky maintains his IQ testing supports a finding of at least a marked limitation in his ability to understand, remember, or apply information. (*Id.*) He also states that his testimony shows he has a marked limitation in his ability to concentrate, persist, and maintain pace. (*Id.*) Lansky argues that his "testimony is bolstered by the opinions of two professionals who are familiar with him." (*Id.*) In addition, Lansky asserts the ALJ erred in finding "only moderate limitations in all areas of adaptive functioning" by relying on his daily activities, which Lansky maintains "does not demonstrate that [his] mental impairment does not meet the requirements of 12.05B2." (*Id.* at 13.) Finally, Lansky argues that the ALJ failed to identify "substantial contradictory evidence to discredit Mr. Lansky's testimony and the opinions of Mr. Lansky's health professionals." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's finding that Lansky did not meet or equal Listing 12.05. (Doc. No. 10 at 6.) First, the ALJ considered the relevant evidence in finding Lansky had a moderate limitation in his ability to understand, remember, and apply information. (*Id.* at 7.) Second, the ALJ likewise considered the relevant evidence in finding Lansky had a moderate limitation in his ability to concentrate, persist, or maintain pace. (*Id.*) Third, the ALJ considered that the medical opinions of record did not support a finding that Lansky met or equaled Listing 12.05. (*Id.* at 8.) The Commissioner argues:

> In fact, no medical source in the record opined that Plaintiff had marked limitations in two mental functional realms or an extreme limitation in any one realm. Tr. 657. Rather, the only person to opine that Plaintiff had even a single marked limitation was Ms. Bundy, who opined Plaintiff had marked limitations in his ability to maintain attention and concentration for extended periods. Tr. 670.

(*Id.*)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at

14

Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his or her decision. *Id.* at 416-17.

Here, at Step Two, the ALJ determined Lansky suffered, in part, from the severe impairments of attention deficit hyperactivity disorder and intellectual disability. (Tr. 17.) The ALJ then proceeded at Step Three to find Lansky did not meet or equal the requirements of Listing 12.05. (*Id.* at 18-21.) As the

regulations explain, Listing 12.05 "has two paragraphs, designated A and B, that apply to only intellectual disorder." 20 CFR Part 404, Subpt P, App. 1, § 12.00A(3). Each paragraph requires that the claimant have significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and evidence that demonstrates or supports (is consistent with) the conclusion that his/her disorder began prior to age 22. *Id.*

Lansky argues the ALJ erred in determining he did not meet or equal the requirements of Listing 12.05B, which provides as follows:

> B. Satisfied by 1, 2, and 3 (see 12.00H):
>
> 1. Significantly subaverage general intellectual functioning evidenced by a or b:
>
>> a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
>>
>> b. A full scale (or comparable) IQ score of 71–75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
>
> 2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
>
>> a. Understand, remember, or apply information (see 12.00E1); or
>>
>> b. Interact with others (see 12.00E2); or
>>
>> c. Concentrate, persist, or maintain pace (see 12.00E3); or
>>
>> d. Adapt or manage oneself (see 12.00E4); and
>
> 3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

At Step Three, the ALJ found as follows regarding Listing 12.05B:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.05 or

16

12.11. In making this finding, I have considered whether the "paragraph B" criteria ("paragraph A or B" criteria of listing 12.05) are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation. The record contains reports of difficulty with understanding, following instructions, and completing tasks, and the objective record confirms decreased intellectual functioning, with an IQ of only 55, with occasionally decreased memory, below average intellect, impaired abstract thinking, and circumferential associations on examination (Exhibit 3E, 1F, 2F, 3F, 8F, 12F). However, the claimant has been alert and oriented on examination, with normal speech, linear thought processes, and normal thought content (Exhibit 1F, 3F, 8F, 12F). The claimant does not have a driver's license and has difficulty managing finances (Exhibit 3E, 8F). However, he is able to live alone, independently care for his personal hygiene without reminders, perform household chores, play cards, shop for groceries, use public transportation, and go to movies and restaurants by himself (Exhibit 3E, 8F, Hearing Testimony). Given this evidence, I find only moderate limitation in understanding, remembering, or applying information.

In interacting with others, the claimant has no limitation. The claimant has been cooperative, calm, pleasant, and engaged on examination, with normal speech and thoughts, and an often euthymic mood and normal affect (Exhibit 1F, 2F, 3F, 8F, 11F, 12F). The claimant is able to shop in stores, socialize with others in person and via phone, text, and video chat, go to the movies, go to restaurants, and use public transportation (Exhibit 3E, 8F, Hearing Testimony). As a result, I find no limitation in the claimant's ability to interact with others.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The record contains reports of difficulty with concentration, following instructions, and completing tasks, and objective evidence of decreased intellectual functioning and ADHD, resulting in decreased attention and concentration and occasionally overactive motor activity on examination, confirms some limitation in this domain (Exhibit 3E, 1F, 2F, 3F, 8F, 12F). However, the claimatn [sic] has been consistently alert and oriented on examination, with normal speech, and generally normal psychomotor activity (Exhibit 1F, 2F, 3F, 8F, 12F). Although the claimant does not drive, he is able to care for his personal hygiene, perform household chores, shop in stores, play cards, watch television, use a cell phone, and use public transportation, activities that would require some level of sustained concentration, persistence, and pace (Exhibit 3E, 8F, Hearing Testimony).

17

Therefore, the claimant experiences no more than moderate limitation in this area.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The record contains evidence of intellectual disorder and substance use disorders, and examinations have been notable for below average intellect, occasionally disheveled appearance, and decreased insight and judgment (Exhibit 1F, 2F, 3F, 8F, 12F). Additionally, the claimant is a Tier II sex offender, as he was convicted of felony sex with a minor in 2018, and he has been placed back in jail for drinking alcohol while on parole (Exhibit 3F, 8F). However, the claimant has been cooperative, pleasant, and calm on examination, with average demeanor, good eye contact, and normal speech and thoughts (Exhibit 1F, 2F, 3F, 8F, 12F). The claimant is able to independently care for his personal needs, generally presenting with at least fair hygiene and grooming on examination (Exhibit 3E, 1F, 2F, 3F, 8F, 12F). The claimant does not have a driver's license and has difficulty managing finances; however, he is able to live alone, shop in stores, use public transportation, socialize with others, and go to the movies and restaurants alone (Exhibit 3E, 8F, Hearing Testimony). Thus, the claimant's difficulty adapting or managing himself is no more than moderate.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria (criteria of listing 12.05) are not satisfied.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

Turning back to listing 12.05, this listing is based on the three elements that characterize intellectual disorder: significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and the disorder manifested before age 22.

* * *

In this case, these requirements are not met because although recent testing revealed a full scale IQ of only 55 (Exhibit 8F), and educational evidence of record confirms onset of intellectual impairment prior to age 22 (Exhibit 1F), the record fails to establish significant deficits in adaptive functioning currently manifested by extreme or marked limitations in understanding, remembering, or applying information, interacting with others, concentration,

18

> persistence, or pace, or adapting or managing oneself, as required by 12.05B2. More specifically, the claimant is able to live alone, independently care for his personal hygiene, perform household chores, shop in stores, go to movies and restaurants by himself, use public transportation, watch television, play cards, and socialize/engage with others, both in person and via telephone, text, and video chat (Exhibit 3E, 8F, Hearing Testimony). Thus, listing 12.05 is not met.

(Tr. 18-21.)

The Court finds substantial evidence supports the ALJ's Step Three findings. In finding Lansky had moderate limitations in his ability to understand, remember, or apply information and concentrate, persist, or maintain pace, the ALJ considered Lansky's full scale IQ of 55 and his reported difficulties with concentration; however, the ALJ assigned greater weight to other evidence in the record, including findings on examination, Lansky's own statements, and Lansky's activities of daily living. (*Id.*) In addition, the state agency psychologists opined that Lansky did not meet or equal Listing 12.05. *Wamsley v. Comm'r of Soc. Sec.*, Case No. 5:18 CV 0269, 2018 WL 6732868, at **1, 2 (N.D. Ohio Nov. 14, 2018) ("[A] state agency reviewing source's opinion *is* substantial evidence sufficient to support a Step Three finding.") (emphasis in original), *report and recommendation adopted by* 2019 WL 580571 (N.D. Ohio Feb. 13, 2019). The state agency psychologists concluded that Lansky's "[a]daptive behaviors are higher than obtained test scores." (Tr. 75, 85.) Even Lansky's treating mental health provider only opined one marked limitation in functioning. (*Id.* at 670-71.)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Lansky would weigh the evidence differently, it is not for the Court to do so on appeal.

However, even assuming the ALJ's Step Three analysis was insufficient, the Sixth Circuit has found that remand is not required where the error is harmless. *See, e.g., Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 364-366 (6th Cir. 2014); *Burbridge v. Comm'r of Soc. Sec.*, 572 F. App'x 412, 417 (6th Cir. July 15, 2014); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006). *See also Ison*, 2017 WL 4124586, at **5-6; *Cygan v. Comm'r of Soc. Sec.*, Case No. 14-14356, 2016 WL 1128087, at **2-3 (E.D.

Mich. March 23, 2016); *Vidot v. Colvin*, No. 1:14 CV 1343, 2015 WL 3824360, at **5-7 (N.D. Ohio June

18, 2015); *Wilson v. Colvin*, No. 3:13-CV-710-TAV-HBG, 2015 WL 1396736, at **3-4 (E.D. Tenn.

March 26, 2015). Specifically, a court may find an ALJ's failure to adequately discuss whether a claimant

meets or medically equals the specific requirements of a Listing to be harmless error when "the ALJ made

sufficient factual findings elsewhere in his decision to support his conclusion at step three." *Forrest*, 591

F. App'x at 366. *See Bledsoe,* 165 F. App'x at 411 (looking to findings elsewhere in the ALJ's decision to

affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out

every fact a second time"); *Burbridge*, 572 F. App'x at 417 (acknowledging an ALJ's step-three analysis

was "cursory" but suggesting that, under Sixth Circuit precedent, it is enough for the ALJ to support his

findings by citing an exhibit where the exhibit contained substantial evidence to support his conclusion).

*See also Ison*, 2017 WL 4124586, at *5 (stating "this Court may review the entire administrative decision

to determine whether the ALJ made sufficient factual findings to support his [step three] conclusion");

*Kerns v. Comm'r of Soc. Sec.*, Case No. 2:16-cv-57, 2017 WL 1324609, at **2-3 (S.D. Ohio April 11,

2017) (finding the ALJ supported its step three determination in her review of the medical evidence,

extensive analysis conducted during the RFC assessment, and credibility determination).

    In the RFC analysis, the ALJ discussed Lansky's mental impairments and noted evidence that

undercut a finding of disability. (Tr. 25-32.) In addition, the ALJ found as follows:

> As shown above, the claimant also experiences symptoms associated with
> intellectual disability, ADHD, and substance use disorders, namely alcohol
> and cannabis, that would reasonably interfere with his ability to perform
> complex tasks, work at a rapid pace, and tolerate a stressful work environment
> (Exhibit 1F, 2F, 3F, 8F, 11F, 12F). Although the claimant has been alert,
> oriented, and able to maintain sufficient concentration to participate in mental
> status examination, he has been occasionally disheveled, with only fair
> hygiene and grooming at times, an occasionally worried/anxious appearance,
> a depressed mood, a depressed and/or blunted affect, impaired abstract
> thinking, circumferential associations, below average intellect, decreased
> memory and concentration, resulting in need for some redirection at times,
> and decreased insight and judgment (*Id.*). As a result, I find the claimant can

20

understand, remember, carry out, and complete simple, routine, and repetitive tasks, with no strict production rate pace requirements, and can adapt to occasional and routine workplace changes. However, the claimant does not require restrictions related to social interaction, nor is he precluded from performing unskilled work, as he has been alert, oriented, cooperative, calm, pleasant, engaged, and responsive, with good eye contact, appropriate dress, normal speech, linear thought processes, normal thought content, an often euthymic mood and normal affect, generally intact attention, concentration, and memory, intact impulse control, and no suicidal or homicidal ideation (*Id*.). Therefore, greater mental limitations are not warranted.

In addition to the objective medical evidence, I have also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of his severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment. However, these factors do not show that the claimant is more limited than determined when setting forth the above residual functional capacity.

The claimant's activities of daily living detract from his allegations of totally debilitating impairment, and instead support the foregoing residual functional capacity. In third party written function reports completed in September 2021, the claimant's case manager, LaVonne Davis, noted the claimant has difficulty with personal care due to limited mobility, requires reminders from shelter staff to take medications, requires assistance with transportation, as he is not medically cleared to drive, and he does not prepare meals, as that is done by staff at the homeless shelter where he resided at the time (Exhibit 3E). Ms. Davis also indicated limited capacity to manage funds, and noted the claimant would benefit from additional education to comprehend maintaining a budget (*Id*.). However, Ms. Davis indicated the claimant is able to go out in his wheelchair on a daily basis, make his bed and wash his clothes with minimum assistance, go out in his wheelchair daily, shop at a local convenience store once to three times a week for basic needs, watch television, play cards, engage with other shelter residents, and socialize with others both in person and via phone, text, and video chat on a daily basis (*Id*.). The record indicates increased/improved activities of daily living as the claimant recovered from surgery, as the claimant admitted in August 2022 that while he does not have a driver's license and continues to reside in a homeless shelter, he is able to go to the grocery stores, movies, and restaurants by himself (Exhibit 8F). The claimant's testimonial allegations indicate that he is able to reside alone in an apartment, do household chores and laundry, listen to music, watch television, and use public transportation (Hearing Testimony). In sum, the claimant's activities, while perhaps somewhat restricted, nevertheless confirm he is not as limited, either physically or mentally, as he has alleged.

\* \* \*

> The behavioral record is likewise limited and sporadic. Although the record indicates a history of learning disability, substance abuse disorders, and ADHD, recent mental health treatment has been relatively limited (Exhibit 1F, 2F). The claimant underwent limited mental health treatment while incarcerated, consisting of individual and some group therapy, with no noted use of medication (Exhibit 2F). More recently, the claimant's mental impairments have been treated with antidepressant medication and melatonin prescribed by a medical provider (Exhibit 11F), as well as intermittent outpatient mental health treatment at Catholic Charities, consisting of medication management and case management services (Exhibit 12F). The claimant has remained symptomatic, thereby confirming the need for continued medication and treatment (Exhibit 3F, 8F, 11F, 12F). However, mental status examinations have revealed generally mild to moderate abnormalities at most, even without use of ADHD medication, and the claimant has not required emergency treatment or psychiatric hospitalization at any time (Exhibit 2F, 3F, 8F, 11F, 12F). This confirms the claimant's mental impairments are adequately controlled with limited, conservative behavioral health treatment.
>
> The claimant has alleged numerous complaints in support of his application for disability, and the record does support some limitations due to his symptoms and allegations. However, when considering the claimant's testimony in light of the limited, conservative treatment record and the mainly mild to moderate examination findings, the claimant's impairments are not as debilitating as he has alleged. The allegations of disability made by the claimant are therefore only partially consistent with the evidence.

(*Id.* at 27-29.)

Therefore, any error at Step Three was harmless.

**B.**    **RFC**

In his second assignment of error, Lansky argues that the ALJ's Step Five finding lacks the support of substantial evidence, as the ALJ's RFC finding "is not an accurate assessment" of Lansky's mental limitations.  (Doc. No. 8 at 13.)  Lansky asserts that "the ALJ failed to accurately assess the limitations resulting from Mr. Lansky's extremely low IQ."  (*Id.* at 14.)  While the RFC limited Lansky to simple, routine, and repetitive tasks, Lansky maintains that "[t]his limitation overstates [his] capabilities."  (*Id.*)  Lansky also challenges the weight assigned to consulting examiner Dr. Evans and the state agency reviewing psychologists, arguing that the ALJ "unreasonably concluded the opinions were not persuasive

22

because the opinions were contradicted by the common every day activities that Mr. Lansky is capable of performing." (*Id.*) However, Lansky asserts that his activities of daily living "do not demonstrate an ability to understand and carry out more than very simple tasks," and further the ALJ "failed to consider that Mr. Lansky requires a case manager to navigate the community." (*Id.*) Finally, Lansky maintains that anything above a Reasoning Level 1 job "exceeds his capabilities." (*Id.* at 15.)

The Commissioner responds that this argument is an RFC challenge, not an attack on the ALJ's Step Five finding. (Doc. No. 10 at 9.) Furthermore, the Commissioner argues that substantial evidence supports the ALJ's RFC findings. (*Id.*) First, the Commissioner maintains that the RFC limitation to "simple, routine, and repetitive tasks accounted for the state agency psychologists finding that Plaintiff could, 'carry out simple, routine, one-to-three step tasks.'" (*Id.*) "Second, the ALJ reasonably explained why he found Dr. Evans's opinion only partially persuasive and did not adopt all his suggested limitations." (*Id.*) Third, the ALJ properly considered Lansky's activities of daily living in formulating the RFC. (*Id.* at 10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that

evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that

24

an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Substantial evidence supports the RFC findings.  As set forth above, the ALJ considered Lansky's mental limitations, including his low IQ, in the RFC analysis.  (Tr. 22-32.)  In weighing and analyzing the medical opinions of record, the ALJ found as follows:

> The opinions rendered by the state disability determination services psychological consultants are partially persuasive. Paul Tangeman, Ph.D., and Karla Delcour, Ph.D., opined on March 22, 2022 and November 23, 2022 respectively that the claimant is capable of simple, routine, and repetitive type tasks; would be able to carry out simple, routine, 1-3 step tasks and make simple decisions in a setting without fast pace demand; would perform best in a relatively static environment where changes are infrequent and/or explained; and would perform best in an environment which does not require strict production or rapid pace demands (Exhibit 2A, 4A). These opinions, which are largely consistent with the foregoing residual functional capacity, are generally supported by the evidence of intellectual disorder, substance abuse disorders, and history of ADHD, resulting in decreased attention, concentration, and memory on mental status examination, and a low full scale IQ score of only 55 on intellectual testing, but normal orientation, good eye contact, euthymic mood, consistent affect, normal speech, thoughts, and associations, and adequate insight and social judgment on mental status examination, cited therein (*Id.*). In addition, the opinions are largely consistent with the remaining evidence of record, including subsequently submitted mental health treatment notes, which contain reports of issues with focus off medications (Exhibit 12F/25), and mental status examination findings of an occasionally disheveled appearance, occasionally circumferential associations, and poor to fair insight and judgment, but normal alertness, orientation, and motor activity, average demeanor, generally at least fair hygiene and grooming, a euthymic mood, congruent/full affect, linear through processes, otherwise intact associations, normal thought content and speech, and no suicidal or homicidal ideation, despite rather conservative mental health treatment (Exhibit 12F). However, the undersigned notes that despite the claimant's low IQ, he is able to live alone, independently care for his personal hygiene without reminders, perform household chores, engage and socialize with others, play cards, go to grocery stores, movies, and restaurants by himself, and use public transportation, all of which contradicts a limitation to

1 to 3 step tasks only (Exhibit 3E, 8F, Hearing Testimony). Thus, the opinions of Dr. Tangeman and Dr. Delcour are partially persuasive.

Consultative examiner Thomas Evans, Ph.D., opined on August 16, 2022 that the claimant is limited to understanding and carrying out very simple instructions in a workplace setting, and is limited to completing very simple, single step tasks in a workplace setting (Exhibit 8F). Dr. Evans noted there do not appear to be any psychiatric reasons that would prevent the claimant from getting along with coworkers and taking directives from authority figures, and there do not appear to be any psychiatric symptoms that would impair his ability to respond to typical workplace stressors (*Id*.). This opinion is only partially persuasive. In so finding, I note the opinion is supported by Dr. Evans's own examination evaluation of the claimant, including intellectual testing which yielded a low IQ score of only 55, and mental status exmaination [sic] findings of decreased attention, concentration, and memory (*Id*.). In addition, the opinion is largely consistent with the remaining evidence of record, which confirms below average intellect, impaired abstract thinking, occasional circumferential associations, occasionally decreased concentration, resulting in the need for redirection, and occasionally overactive motor activity on mental status examination (Exhibit 2F, 3F, 12F). However, I note that evidence of decreased cognitive functioning, occasionally disheveled appearance, and often decreased insight and judgment on exmaination [sic] confirm some difficulty tolerating workplace stress (*Id*.). On the other hand, however, the claimant's rather extensive activities of daily living, which include living alone, independently caring for his personal hygiene without reminders, performing household chores, engaging and socializing with others, playing cards, going to grocery stores, movies, and restaurants by himself, and using public transportation, confirm the claimant is not restricted to very simple, single step tasks (Exhibit 3E, 8F, Hearing Testimony). Therefore, Dr. Evans' opinion is partially, but not fully persuasive.

* * *

The claimant's mental health provider, Amber Bundy, LPCC-S, rendered an opinion on February 10, 2023 wherein she noted the claimant would be off task 15 to 20% of the time, and would be absent from work 2 to 4 times per month (Exhibit 10F). Ms. Bundy additionally opined the claimant is markedly limited in his ability to maintain attention and concentration for extended periods (*Id*.). She noted moderately limitations regarding the claimant's ability to remember locations and work-like procedures, remember very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from

26

supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (*Id*.). Ms. Bundy opined the claimant is not significantly limited regarding his ability to carry out very short and simple instructions, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others (*Id*.). This restrictive opinion is not persuasive for several reasons. First, the opinion is inadequately supported, as Ms. Bundy notes low intellectual functioning and likely episodes of inattention and inability to stay on task while working, difficulty following directions and accepting feedback, and need for reassurance, she does not discuss specific objective abnormalities on mental status examination, such as abnormal psychomotor activity, impaired alertness, decreased attention, concentration, or memory, or abnormal speech or thoughts, to support the extreme limitations contained therein (*Id*.). Furthermore, the opinion is inconsistent with the remaining evidence of record, namely mental status examination findings of an occasionally disheveled appearance, with only fair hygiene and grooming at times, an occasionally worried/anxious appearance, a depressed mood, a depressed and/or blunted affect, impaired abstract thinking, circumferential associations, below average intellect, decreased memory and concentration, resulting in need for some redirection at times, and decreased insight and judgment, but normal alertness and orientation, generally normal psychomotor activity, an often euthymic mood and normal affect, consistently normal speech,. linear thought processes, and normal thought content (Exhibit 2F, 3F, 8F, 11F, 12F). Additionally, the opinion is inconsistent with the claimant's rather extensive activities of daily living, which include living alone, independently caring for his personal hygiene without reminders, performing household chores, engaging and socializing with others, playing cards, going to grocery stores, movies, and restaurants by himself, and using public transportation, confirm the claimant is not restricted to very simple, single step tasks (Exhibit 3E, 8F, Hearing Testimony). As a result, Ms. Bundy's opinion is not persuasive.

(*Id.* at 30-32.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.   20 C.F.R. § 416.920c(a).   Here, the ALJ assessed both the supportability and consistency of the medical source opinions, considering the limited mental health treatment records, findings on examination, and Lansky's own statements.

The ALJ also considered Lansky's activities of daily living.  Lansky told Dr. Evans he could go to the grocery store, the movies, and restaurants alone.  (*Id.* at 654.)  Lansky testified at his June 2023

hearing that he had lived alone for the past three months, it was going well, and he handled all his chores. (Tr. 46-47.)  He further testified he shopped twice a week for groceries, he had no problem taking the bus, and he could take the bus to an unfamiliar place because he could follow directions.  (*Id.* at 48, 54.) An ALJ may consider a claimant's activities of daily living and compare that against the medical evidence when assessing a claimant's RFC.  *Doornbos v. Comm'r of Soc. Sec.*, No. 17-1464, 2017 WL 8948744, at *4 (6th Cir. Dec. 13, 2017); *see also* SSR 85-16.

As set forth above, in determining Lansky's RFC, the ALJ did not rely solely on the nature and extent of Lansky's activities of daily living, but also properly relied on the numerous normal physical examination findings in the record as well as the generally benign objective test results discussed above. *See e.g., Walker v. Comm'r of Soc. Sec.*, Civil Action 2:15-cv-558, 2016 WL 692548, at *16 (S.D. Ohio Feb. 22, 2016) ("According to Plaintiff, the ALJ erred in relying on his activities of daily living because they fall short of establishing an ability to engage in full-time employment. Plaintiff's argument is unavailing because the ALJ did not rely exclusively on his activities of daily living in formulating his RFC or assessing his credibility. Rather, the ALJ properly considered Plaintiff's activities of daily living as one of several factors."); *Rodriguez v. Comm'r of Soc. Sec.*, Civil Action No. 16-11523, 2017 WL 1362701, at *5 (E.D. Mich. Feb. 21, 2017) ("In this case, where the ALJ considered the relevant medical evidence— including Rodriguez's treatment notes and statements made to his physicians—as well as Rodriguez's activities of daily living, the Court finds that the ALJ acted squarely within his authority in determining Rodriguez's RFC.")

Again, it is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Lansky would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

28

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: March 25, 2025                                    _s/ Jonathan Greenberg_
                                                              Jonathan D. Greenberg
                                                              United States Magistrate Judge